Good morning, ladies and gentlemen. Our first case for this morning is Dana Container v. Secretary of Labor. Mr. Coleman. Thank you, Judge Wood. May it please the Court, Your Honor, in a case like this, visualizing what the wash and entry procedure described by the record actually looks like is really essential to understanding why we believe that the agency erred in saying that Dana knew or should have known that Bobby Fox was going to do the things he did or in rejecting the ALJ's alternate entry decision. And I brought a little aid, and this follows what the record says at pages 1024 to 1027. This is how one of these is washed. It comes in empty. The bottom is open. The top is open. Something that looks like a baby bottle washer that's twice as large as me goes inside. It can fire liquid in all directions, and it makes a strenuous brushing motion. The first thing that happens is misstated as a rinse. What it really is is this thing scrubbing while spewing out hot water. At the end of the rinse, if a caustic… Counsel, I'm not sure what function this serves. There is agreement, I take it, that Fox violated all sorts of procedures, right? So what the normal procedures are doesn't really matter. Well, Your Honor, Judge Easterbrook, I would say that what the normal procedures are… We're dealing here with the question whether Fox's knowledge is imputed to the employer, not whether Fox departed from authorized procedures. That's correct, Your Honor, but that depends on foreseeability. Now, virtually all the circuits that have addressed it have said that the mere fact that Fox is a supervisor is not enough to make that inference. But if it was foreseeable from evidence in the past, if something happened in the past that would have given Dana reason to know what Fox was going to do, then Dana… Does any court say it has to be that specific what Fox was going to do on a particular day? What the agency said in this case, as I read its opinion, is that if you look at the reports that had been filed with Dana Container, they showed repeated deviations from procedures about which Dana's management did nothing, and that that was enough to impute what Fox did to the company. Now, that may be right or that may be wrong, but that seems to me the thing that needs to be addressed. Well, and Your Honor, we'd say that is wrong, because just picking a case at random among those that involved that, PPNL, the Third Circuit's decision, the Third Circuit there involved… What was involved there is what is very similar to what's involved here. A supervisor did something very unexpected, and the question was whether the past inconsistencies in the safety program could predict these violations. But I think that the agency, as I read its opinion, maybe is saying something along the following lines. Look, you know, one failure to fill out a permit properly, maybe you don't draw any inference from it. Ten failures, but they find repeated failures that show a pattern that makes the possibility that somebody is once again going to violate protocols in a way, of course, that turned out badly for Mr. Fox. It was exactly the risk that these various safeguards are supposed to avoid. And so our issue is whether the agency legitimately could draw that inference from this very substantial pattern of carelessness. But, Your Honor, the pattern did not support the inference. The pattern might support… Well, why not? I mean, you're saying that. I understand you don't want it to, but it's not clear to me why that's the conclusion we have to draw. I'm looking at these tank entry permit deficiencies on page 8, and there are miscellaneous problems with quite a few of them. If Your Honor made that inference, these permits have had these issues since 2002. OSHA's never cited for them, but more importantly for you. But why does that matter? I mean, I can see why OSHA, and in fact you don't want a rule that has OSHA jumping on you for every tiny permit problem, but if a pattern begins to develop, then why is the agency not entitled to draw an inference from that pattern? Because, in this instance, Your Honor, the inference wasn't reasonable. Did what Bobby Fox do happen before? Yes, it did. It happened in 2002. Two people failed to complete a permit at all. Now, none of these permits are, in fact, required under alternate entry. Something less is in… Well, alternate entry is a different path altogether. It is. It is. But two people did that. They were disciplined. They never did it again. One person did it in 2006. He was disciplined. He never did it again. If you were to draw a pattern from the mere fact that there was some missing information off of some of the permits, we would expect people to be diving into tanks in 2003, 4, 5, 6, 7, 8, and 9. The inference doesn't follow. Why does it have to be that particular? I mean, you've got these problems that are building up, and, of course, Mr. Fox is somebody himself who should have known better. As everybody says, he was a supervisor, and he is in a hurry, and it's a cold January night or time, and he just goes into the tank dirty. But, Your Honor, this particular evidence is not predictive of what happened. But I guess your idea is that the exact same thing has to have happened before, before there's foreseeability. Not the exact same thing, Your Honor, but in what PP&L said, it really has some good language that addresses exactly your concern. And what it says is, employers should be encouraged to develop work rules that will reasonably respond to their particular working conditions. And I'm paraphrasing, should be evaluated with that end in mind and not with a myopic view of literal compliance with OSHA. What that really means is that. That sounds awful, actually. It sounds awful, but in the real world. A myopic view of literal compliance with OSHA? In the real world, in Chicago, at night in January, the question's going to be, are you going to follow the right work rule to keep you safe? And people have consistently done that. They have also consistently not filled in blanks and permits before, during, and after. So one does not support the other. Just merely being unable to fill out permits completely is one thing. Failing to fill them out at all, failing to test it all, is unheard of. And that's what Bobby Fox did. If Fox is being cited for failing to fill in some of the blanks of a permit, okay, we've got a pattern of that. The pattern supports that. What the pattern doesn't support, though, is it doesn't support him hopping into an unwashed tank. So what's the point of these permits? The point of these permits in the way they are used is essentially to document test results. No, they're not. There's post-entry error monitoring. There's a duration of authorization, which is either not specified or exceeding. That's related to entry or exit times. Who's in? Who's out? Did a supervisor approve it? That surely all is designed to make sure that the facility operates safely. My habit. Your Honor, here, as in PP&L, where they followed, they should have had a work rule. They should have had a work rule saying keep that boom away from that wire this distance, the way OSHA says. Instead, they followed work plans where they wouldn't bring the boom truck in in time. Somebody did one day and got electrocuted. The Third Circuit, I think, rightly held, look at what they were doing. Was what they were doing safe? Was it in accordance with, was it predictive of what this guy was going to do? And the answer is no, it wasn't. And that's what we have here. Now, of course, the agency says that even if we were to follow the Third Circuit's rule, there's sufficient foreseeability here. And it points out that of the circuits to which you might have taken this petition for review, the Third Circuit is the most favorable to you. So it seemed, although they didn't think favorable enough that it would have mattered, but it sounds to me like you're asking for a more particular type of foreseeability than even the Third Circuit asks for. No, Your Honor. And why we need to ask for it or the D.C. Circuit is another matter altogether. But, Your Honor, I would respectfully disagree because the evidence involved here. Well, that is what the agency said. I mean, you can certainly disagree with their thought. I do. I know that's what they said. I do. The agency also said there wasn't continuous monitoring while the person was inside the tank, while air was blowing, and that's just false. There was, page 1696 of the record, there was continuous monitoring. The administrative law judge, when you dig back down that far, found that this was a, I'll just say, a troublesome record. There was testimony all over the block. She had to make all kinds of credibility determinations. She did, but many of the witnesses didn't speak English, Your Honor, and it's real easy to say witnesses look coached when they're not speaking in their native language and speaking through an interpreter. Well, we have interpreters in a lot of cases in the courts, too. I assume they're mostly Spanish speakers, the non-English speakers. Yes, well, Spanish is mostly their second language, but English is not their first. What is their first language? Mayan dialects, mostly. Oh, okay. But the difficulty I think we have here with this inference is that you just can't, you can infer, yeah, if he had, if the question is did he fill out the subpart F information, can you infer that him not doing that was foreseeable? Sure. That's supported. Can you infer he's not going to test or he won't fill out a permit at all, something people haven't done in the past, in hundreds and hundreds of entries? No, that's not a reasonable inference from these facts. And as Judge Easterbrook noted, you noted in your decision, Judge Easterbrook, in Caterpillar Logistics, you can't just look at substantial evidence. No, it's not any particular judge's decision, judicial decision. It's the Seventh Circuit, but Your Honor pinned it. It doesn't make any difference. You don't want it to be making ad hominem arguments. Oh, I'm sorry, Your Honor, I didn't mean it in that way, but that Seventh Circuit decision was very specific on evidence and inference from evidence, and what it says is you can't, you've got to look at all of the evidence. This wasn't a reasonable inference. Now, moving on to alternate entry, which is a before. But, of course, we are into the substantial evidence. This is not our job to sit down and read through all of this and come up with what we think should happen. We just have to decide if the agency was within boundaries. Well, and legal boundaries. Both legal and factual. There has to be substantial evidence, and I'm not understanding that there's much of a legal argument here. I thought you were just talking about the evidence. Well, I think there was in that the OSHRC didn't place the, should have placed the burden on the solicitor, but in the end, the evidence does matter, and in the end, the most important thing to me, Your Honor, is even if you do find, even if you do say that the agency correctly inferred knowledge, under the Stark decision of this circuit earlier this year, the definition of willful clearly was not met. The definition of willful there is the employer knew it was unsafe, knew it was serious, knew they could do something, and then chose not to do it. So the counterfactual I would ask you to address is suppose people had taken this permit process seriously and they had filled things out. Wouldn't that have created a culture of compliance at the place that the commission thinks is missing? Well, Your Honor, on the things the commission cited, there was a commercial, there was a culture of compliance. Everybody but Bobby Fox did comply. The commission didn't cite for incomplete permits. It did cite for entering a tank. Nobody did that without testing or without completing a permit except. Or at least we don't have recordings that other people had done that. But we also have. One of the things that goes on when people depart very seriously from the rules is that they don't then leave records of serious departures. That's true, Your Honor, except the ALJ made a finding, and we discussed that at pages 4 and 5 of our reply brief. The solicitor made exactly that argument at trial, and it was rejected. The fact of the matter is. . . I think what the ALJ said was that there wasn't evidence that she was able to credit that there had been deviations, which isn't quite the same thing. Well, I think when the solicitor has the burden of proof, that is the same thing. And I see I'm now getting into my rebuttal time, but I did want to make one last point specifically about willfulness. Your Honor, this evidence, if it supports knowledge, it can't possibly support willful. Dana did do something. Dana trained these people on how to do the things Bobby Fox did not do. Eight witnesses testified they followed this training, including Bobby Fox, except on this occasion. There is discipline in the record for every single incident where somebody deviated from this. If Your Honor affirms and infers knowledge, I respectfully disagree. I understand. But willful, as Stark defines the term, is simply not in the picture. And I'll answer any questions, if Your Honors have them, on alternate entry, but I'd really like to reserve the rest of my time for rebuttal. That's fine. Let me do that. Thank you. Mr. Gottlieb. May it please the Court? The inference that Mr. Fox would bypass the permit and testing requirements were foreseeable for the reasons stated by you. Please speak up. Well, the inference that Mr. Fox would bypass filling out a permit and doing the initial testing were reasonably foreseeable, precisely for the reasons that the Commission determined. Dana did not issue a single instance of discipline in the year preceding Mr. Fox's entry. But what if the reason it didn't do that is because nobody was entering the tanks in a way that was not acceptable under its rules? One, that's not true, because one of the permits actually showed that somebody entered the tank before the wash procedure had been initiated, and the supervisor did not even follow up on that permit. And two, it's not relevant because all of these many, if not all of the violations, all violations of life-saving requirements. For example, Mr. Fox himself exceeded the durational limit of a permit of 20 minutes on four separate occasions, including two occasions in which he stayed in there for over two hours. On none of these occasions was there any indication that post-entry monitoring was performed. On three of these occasions, no attendance was listed. So are these occasions during which, when you say post-entry monitoring, you mean of the atmosphere, what was in the atmosphere, what were the levels of various substances? Of any substances of oxygen deficiency or flammables. The point being that these were not just mere record-keeping violations. There's no reason to assume that they were. Certainly, the data presented no evidence that they were mere record-keeping violations. For instance, evidence that, yeah, I just forgot to list Caesar as the attendant. And certainly, overextending the duration of the permit is not a record-keeping thing. The duration requirement is designed to protect the employee from the atmospheric hazards in a confined space. So all of these violations of the duration requirement, the attendant requirement, the post-entry monitoring, are designed to protect against the same hazard that Mr. Fox exposed himself to on January 28, 2009, when he went into the tank, and that is the atmospheric hazards of a confined space. Well, how far does the agency's view of imputed knowledge extend? Suppose, just to create problems for Dana, Fox had thrown one of his subordinates into the tank, locked the cover, and the subordinate had suffocated. He had done this deliberately for the purpose of killing the subordinate and injuring the employer. Would OSHA add a penalty? Based on the record of the violations that occurred here? Yeah. It's hard to say. I mean, certainly if there was, I doubt it. I mean, if there was evidence that this was a malicious act. But I guess the other point I wanted to make is that the evidence is not good. Look, the reason I ask this question is because I wanted to hypothesize an act that was in Fox's interest to the detriment of his employer. What actually happened in this case was an act that Fox perceived to be in his interest to the detriment of his employer. He was going to do something to make his job easier for him, and he didn't really care about his employer, and it turned out, surprisingly to him, to be both to his detriment and the employer's detriment. Why would OSHA then add a penalty to the detriment that the employer has already suffered from this self-interested behavior by its supervisor? But there's no evidence that he intended to act to the detriment of his employer. He was working, he was doing it for his job. He knew the employer had rules, which he was deliberately not following. He was exposing it to all sorts of problems if what actually happened happened. He was doing this for his own interest so he could get home earlier, do his job easier, not follow the rules. Employees, of course, do this from time to time. This is an extreme version of it. But my question is what sense it makes to add penalties to the penalty that Dana has suffered through the need to cover workers' compensation claims. I mean, you can add this up. Why does the government want to add a penalty to something where the employee has injured his own employer in the quest of helping himself foolishly? Because we want employers to enforce their safety programs. It's kind of a broad version of the nanny state. I disagree with that. This was the safety program that it developed. And like I said, he wasn't doing this to the detriment of the employer. He was doing this because he knew that he was not likely to suffer any consequences. He was doing it to help himself. He was deceiving his employer. And, of course, he ended up injuring himself and his employer. And OSHA now wants to add injury to injury. This looks like the kind of thing that would be self-deterring on both sides, with or without the Department of Labor piling on. Well, that suggests that there's less reason to issue a penalty when there's an accident or an injury than when there's not. And that's why we want the employer to enforce the safety program so there is a cultural compliance so employees don't make these decisions. So it really, just to slice it a little more thinly, this is certainly not Mr. Fox on a personal vendetta to murder his fellow employee, as in Judge Easterbrook's hypothetical. On the other hand, you could say he's doing the employer's work, which is to unclog the valve so that the tank can be cleaned, but he's not doing it in a manner approved by the employer. So whether you want to look at that as doing the employer's business, he's just trying to unclog the valve. There's a way to do that and a way not to do that, and unfortunately he chooses the wrong way. So I think that's where one has to just be precise about how the employer wants these things done. So if we then move to the situation every time an employee chooses a manner of doing work not approved by the employer, is he still acting within the scope of his employment? Is he still under agency considerations doing things for which the employer is answerable? That's the question I would ask. Well, and I think that's right, and I think it is he was acting in the scope of employment, and he did it because he knew his employer didn't enforce its requirements. And he wouldn't have been in the murder case. I'm sorry?  Yeah, I think that's obvious. And there was no finding by the ALJ that this type of incident had not occurred in the past. The ALJ found that the evidence was insufficient to say that it hadn't happened on a regular basis. Well, the ALJ doesn't say that it ever happened in the past. She just says the evidence isn't good enough. Some people tried to testify, and she's kind of unhappy, actually, not just with the people who she thinks is coached. She's unhappy with a lot of the testimony, but she does what she needs to do. She draws credibility, determinations, and decides what happened here. Right, but I just meant to say that she just found it hadn't happened regularly, that they didn't routinely go into tanks, not that it didn't happen on occasion. And, in fact, in their reply brief, they admit that there should have been more permits for the amount of entries that occurred. So when you say go into tanks, you're talking about the whole scope of, you know, whether it's a dirty tank or a clean tank or, you know, buffing off some substance or whatever it is. In the opening brief, they tried to accuse the Commission of cherry-picking the permits. When we pointed it out, and they referred to all the permits they applied. Yes, they did. Then when we showed that their permits didn't show any additional entries in 2008, they said that the Secretary was cherry-picking. But they had control of the permits. The reasonable inference that the Commission drew is that we presented all the permits that we were given. And so the fact that there are no additional permits does support the inference that this had occurred before, or at least maybe not in a dirty tank, but at least that people had entered tanks without filling out permits and filling and putting out, doing initial monitoring. So what about Mr. Coleman's point about willfulness? Even if the company should have, in this culture where they're not keeping track of what's happening properly, was committing serious violations, where's the willfulness? The willfulness was found based on Mr. Fox's state of mind. That's really Mr. Fox. Yeah, well, he certainly was. And the law is that if his knowledge is imputed, his willful state of mind is imputed, unless there are good-faith efforts to prevent the violation. And Stark shows that there wasn't good-faith evidence. There wasn't evidence of good-faith efforts to prevent the violation because Dana wholly failed to implement the safety program. And therefore, on January 28, 2009, it was foreseeable that Mr. Fox would choose expediency over safety. So at some point, I mean, your argument has to be that at some point all these permit violations, I guess the problem that the permits are designed to forestall was going to happen sooner or later. Maybe they were lucky and it finally happened in the January incident that we're talking about. Because one of their arguments is that you're leveraging too much from the permit violations over to what happened, they would say, in a very unexpected way on January 28, 2009. Well, that's their argument, but I don't think that we are, because of the number and scope of the violations, in addition to the evidence as to why Mr. Fox decided to choose expediency over safety. Well, right, and the permit rules are designed to implement tank entry safety protocol. Correct. They're not sort of stand-alone requirements. We're not finding them willful because they had some defect in their electrical safety program, or a different area. These violations are related to what happened on January 28, because it's the same exposure to atmospheric hazards when entering a confined space. Maybe we could talk a little bit, and I certainly will invite Mr. Coleman to say what he wants to, about these alternate entry procedures. Are they pertinent here? They had the burden to prove that they met the criteria for using alternate procedures, and to meet that burden, they had to prove that they had demonstrated, before they implemented alternate entry procedures, that ventilation alone was sufficient to maintain the tank safe. And I thought there was no way that you could say an uncleaned tank, at least one that had ink in it, would comply with that, with those rules. If ventilation alone would handle that? Well, that's probably correct. The focus has been whether they could do it for clean tanks. Right, and this wasn't a clean tank, so I was a little confused why we were talking about alternate entry. Well, because some of the violations were not keyed to Mr. Fox's entry. They agreed that the alternate entry procedures didn't apply to Mr. Fox. To Mr. Fox, okay, fine. So the violations that were related to that. Is that the only question you had about it? I mean, do you want me to go more into it? That's fine for now. Okay. Okay, unless the Court has any further questions, the Secretary requests that the petition for review be denied. All right, thank you. Mr. Coleman. Your Honor, unlike in a district court, your Honors know we have to dance with the one that brung you in the case of an agency review. It's whatever the OSHRC found. The OSHRC did not find other permitless entries. That was not among the OSHRC's findings. The reason it wasn't is because the solicitor didn't prove it. It is not our burden to prove that there were other permitless entries or that there were other permits. It's the solicitor's. The solicitor simply did not produce evidence and now asks this Court to assume that this is something more than what your Honor said was just paperwork. This isn't just paperwork violations. Respectfully, yes, it is. And it is for two reasons. Even though Bobby Fox, we can never justify what Bobby Fox did under alternate entry that night because he didn't do what alternate entry requires, if you're going to infer intent from what amounts to alternate entry documents, you have to look at them as alternate entry documents and not as permits. And alternate entry documents require what's the name of the tank, where is it, test results, and a certified signature. That's it. None of the deficiencies they talk so much about are required by alternate entry. Maybe we swung and missed, but surely we can't get some kind of inference definitely of a willful or I contend of knowledge from that. So it's the solicitor's burden. One other thing he said that if it had been true, it would have been shocking, is that people go in all the time and these permits show there was no post-entry entries. Well, there's a reason for that, and that's why I think I wanted to mention at the outset how the entry procedure works. If I'm going in the tank and I'm hooked off, like Bobby Fox wasn't, and I've tested and I've completed my document, there's constant ventilation going. So first of all, the atmosphere is not going to change, but we don't presume that. Page 1696 of the record says a monitor comes after us. The OSHRC said there was no post-entry monitoring. That's false. That's not what the record shows. There is post-entry monitoring, and that monitor is going to chirp, beep, alarm, whatever, if something is outside of OSHA's parameters. It was tested in when the person first went in, but after the person's in, the monitor goes after them. So it's just not correct to say... Is that the once-an-hour thing? I'm trying to remember. It's not all that frequent. That's different, and it may be confusing. Once-an-hour might be testing is what Tom intends, and then you're supposed to write down the results, which, as you can see, wasn't done. But monitoring is something different. The monitor is in there with you all the time, and it's going to alarm. You're not going to have an entry to put in, but it's going to alarm if it's out of sync. Bobby Fox acted in violation of rules he knew. He acted in violation of training he knew. Maybe it's not the same as throwing his co-worker in the tank, but one thing is for sure. Dana took the position it did in accordance with Stark. It knew it was serious, but it took steps to prevent what Bobby Fox did, and evidence to prevent the violation is exactly what we had here in my red light zone. All right, thank you very much. Thank you as well to Mr. Gottlieb.